# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
September 17, 2013 Session

## STATE OF TENNESSEE v. JOHN T. VINE, II

**Appeal from the Criminal Court for Davidson County**
**No. 2009-D-3169     Seth Norman, Judge**

---

**No. M2012-02376-CCA-R3-CD   Filed November 8, 2013**

---

John T. Vine, II ("the Defendant") was convicted by a jury of two counts of aggravated sexual battery and one count of solicitation to commit aggravated sexual battery. Following a sentencing hearing, the trial court sentenced the Defendant to an effective sentence of twenty-two years' incarceration. On appeal, the Defendant challenges the sufficiency of the evidence supporting his convictions. He also argues that the trial court committed plain error in admitting as evidence the videotaped recording of the Defendant's interview with police. Finally, the Defendant challenges the length of his sentences and the trial court's imposition of partially consecutive sentences. After a thorough review of the record and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments**
**of the Criminal Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and ALAN E. GLENN, J., joined.

Kathleen G. Morris (on appeal) and Newton Holiday (at trial), Nashville, Tennessee, for the appellant, John T. Vine, II.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Victor S. (Torry) Johnson III, District Attorney General; and Sharon Reddick, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

A Davidson County Grand Jury indicted the Defendant on two counts of aggravated sexual battery and one count of solicitation of a minor. The Defendant proceeded to a jury trial on May 21-22, 2012.

LS[1] was sixteen years old at the time of trial. She testified that her mother ("Mother") was primarily responsible for raising her and her four older brothers. She identified the Defendant and stated that she met him through her church. She had known him as long as she could remember and considered him a "grandfather-type of figure." LS continued, "He would pick me up from school, spend time with me, take me to his house, we'd go out to eat, like family occasions and family meetings." The Defendant asked that LS and her brothers call him "Granddad, grandfather."

Around the time that LS was eleven years old, approximately 2006 to 2007, her relationship with the Defendant began to change. On the first occasion, LS was in the kitchen of the Defendant's house. The Defendant asked LS for a hug, and when they hugged, he placed his hands on her "behind." LS was not sure "if it was something that was supposed to be done," so she did not tell anyone about the incident. She clarified later that the Defendant touched her over her clothes. As LS got older, the Defendant would take pictures of LS's backside, which LS found unusual.

One night, LS spent the night with the Defendant at his house. She had not spent the night with him before, but her "mom just had [her] spend the night." LS went to sleep in the guest bedroom. At some point, she woke up and realized that "[h]e was behind [her] – [she] just felt him moaning, and . . . that his toes was [sic] on [hers]." She also remembered that "his hand was around [her] waist." LS went back to sleep, and when she woke up, she was lying at the foot of his bed. She was confused at the time as to how she got there. The Defendant told her that, if Mother asked, LS should say that she slept in the guest bedroom.

On another occasion, she was in the car with the Defendant, and he told her "about sex, the penis, and sex positions, and how women can masturbate." She continued, "He was telling me how women have to drop down and how the guys have to move their penis in order for it to go in." LS remembered him telling her that it was more comfortable for women to use lotion with their two fingers when they masturbate.

---

[1] It is the policy of this Court not to use the names of victims of sexual crimes.

At some point, the Defendant told LS that she would need to let him touch her "for all of the nice things he had done for [her] and [her] family." Regarding one occasion, LS recalled, "My bathing suit was too small so he said that he would buy me another one, but in order to do that I would have to let him see me in my small bathing suit." The Defendant "got mad" when LS refused his request.

On another occasion, LS was alone with the Defendant in his office at church. The Defendant told LS that she was "ashy" and that he had some lotion. LS recalled, "He just told me to come here and he put lotion down my butt." She continued, "He rubbed some lotion on his hands, and then he placed his hands down my pants." She clarified that the Defendant put his hands down the back of her pants "[o]n the skin" while she was standing up. In the car on the way home, the Defendant told LS "that he had a dream about [her] and that he just hoped that God wouldn't let him have dreams about [her] like that, about him touching [her]." At this point, LS became concerned about the way the Defendant treated her.

LS testified that, on one occasion, she called the Defendant to ask him to order pizza for her. According to LS, he told her, "I will order you the pizza . . . but . . . you have to do something for me." She asked if it was for him to see her in her bathing suit, and he said, "No, something else. . . . You have to let me touch you." LS told the Defendant, "No, and if you try then I am not going to come over to your house anymore and I am not going to be around you." She agreed that it was common for the Defendant to bring food to her and her brothers.

After this conversation, LS decided that she needed to tell someone about these incidents. She first told a friend her age, and then she decided to tell Mother. LS's friend had told LS that a "grandfather" was not supposed to treat her like the Defendant had treated her. LS worried about telling Mother because of everything that the Defendant did to help her family and was afraid that all of it might end. According to LS, when she told Mother, "[Mother] was hurt, she was shocked, she was surprised, she was just confused about everything." LS believed that Mother reported these incidents to the police that day. LS eventually spoke with Detective Maria Sexton regarding these incidents.

On cross-examination, LS stated that, around the time that she slept over at the Defendant's house, she routinely slept with Mother at her home. She did not recall being scared of the dark or being in the guestroom by herself when she spent the night with the Defendant. She recalled that, when she found the Defendant in the guest bed with her, she was under the covers, and he was not. According to LS, the Defendant was moaning, and she did not believe that the sound could have been the Defendant's snoring.

-3-

LS confirmed that, when the Defendant bought her a new bathing suit, he did not watch her try it on. She stated that, when he rubbed her "butt" in his office at church, he used both hands. When the Defendant offered to buy LS pizza if she let him touch her, she believed that the Defendant meant "touching" in a sexual way.

LS identified a document she compiled of these instances with the Defendant, and she acknowledged that the incident regarding the Defendant's hugging her in his kitchen was not on the list. Other people were in the house on that occasion, but those people did not see the incident. LS agreed that, when all of these events occurred, she was going through puberty. She confirmed that she had questions about this stage of life and felt comfortable talking about it with the Defendant.

Mother testified that LS was the youngest of her five children. Mother met the Defendant at church in 1998. At that time, the Defendant was an associate minister at the church, and part of his responsibilities was working with children. Mother continued,

> [The Defendant] sort of like adopted us as his family, and he would help us with things, like financially. He would help the children in school, like be an advocate you could say. Anything that they were dealing with he would help out, anything concerning school, buying clothes, or help us with food.

Mother confirmed that the Defendant helped pay some of her bills on occasion. At first, her children called the Defendant "Uncle Vine," and at some point they began calling him "grandaddy." The Defendant took Mother and her children to Chicago to meet his blood-related family. She stated, "I was really thankful that [the Defendant] took such a deep concern of [her children] because I never had no [sic] one to reach out to my children like that before."

At some point, the Defendant left the church Mother attended and began working at a different church, but his relationship with her family did not change. Later on, one Sunday morning, LS told Mother that "[the Defendant] had touched [LS], went in her pants with some lotion – rubbed her body down with some lotion in her pants and was taking pictures of her." Mother told a friend and her pastor at church, and then she confronted the Defendant. Mother testified regarding this conversation,

> He dropped down his head and he said, I'm so sorry. He said, I am a fool, and God forgives fools. He said, I did that. I said, Why? . . . He said, I get lonely sometimes. He said, I know that was wrong and I'm so sorry, I hope that y'all can forgive me one day.

As she left his house, he told her, "Call me if you need any money." Sometime after this conversation, she reported the situation to the police. Mother and LS spoke separately with the detective regarding these incidents. Mother agreed to call the Defendant while the detective listened and recorded the conversation. She had not had any communication with the Defendant since this phone call.

On cross-examination, Mother acknowledged that the Defendant had told her about his discussions with LS regarding puberty and that LS felt more comfortable speaking about these matters with the Defendant instead of her. The Defendant suggested to Mother that she should give LS birth control at eleven years old, and Mother discarded his suggestion.

Pastor Bruce Maxwell testified that he had been the pastor at Lake Providence Missionary Baptist Church for thirty-six years. He estimated that the church had approximately 5,800 members. He became acquainted with Mother and her family when they started attending that church approximately ten to twelve years prior to trial. The Defendant became involved in the church approximately twenty years prior to trial, when the Defendant became an associate minister. Part of the Defendant's involvement was working with children and youth. Pastor Maxwell explained that the church had a policy that, "[i]n order that there not be any type of situation that arises as to where there is indiscretion where there is a child's word against an adult, there should always be other adults who are present at that time within that ministry." He confirmed that he had had individual conversations with the Defendant regarding "appropriate interactions with young people within the church." Pastor Maxwell was aware that, when the Defendant left the church, the Defendant maintained a relationship with Mother and her family. Pastor Maxwell, however, was not aware of the extent of that relationship.

Pastor Maxwell stated that, in the summer of 2008, Mother called him in tears and told him what had happened to LS. Most of the conversation took place over the phone, and then they spoke in person at church regarding the incidents. He encouraged Mother to contact the police. Shortly after his conversation with Mother, the Defendant came to his office. Pastor Maxwell testified,

> [The Defendant] faked a cry to try to squeeze out a tear and I asked him, What have you done, and why did you do it? He was sitting there, and he was shaking his head. I asked him specifically, What he had done and he told me at that time that he had gotten carried away. He had started to put lotion on the child's back, and he did tell me he tried to get into her panties to get to her privates.

The Defendant told Pastor Maxwell that he was seeking counseling. On cross-examination, Pastor Maxwell stated that Mother had told him that the incident with the lotion occurred at the Defendant's home. He confirmed that he had had numerous disagreements with the Defendant.

Detective Maria Sexton testified that, in 2008, she was working in the sex crimes division of the Metropolitan Nashville Police Department ("MNPD"). Once assigned to the present case, she decided to speak with LS directly, based on LS's age and the fact that LS "seemed very articulate." Detective Sexton did not believe that LS had any trouble understanding her questions. Although she acknowledged that children sometimes "err on the side of exaggeration," she stated that LS "seemed like she was very careful with the truth."

Detective Sexton stated that in most investigations they can expect physical evidence to be available for seventy-two hours following an alleged incident. She would not expect to obtain any physical evidence of an incident in which an individual allegedly "fondled [a child's] buttocks." Accordingly, in the present case, Detective Sexton believed that the best way to corroborate LS's allegations was to have a "controlled phone call" in which Mother initiated a recorded telephone conversation with the Defendant. She identified at trial the recording of this conversation, which occurred on June 5, 2008, and it was played for the jury. In that call, the Defendant said to Mother, "I told the pastor that . . . I was inappropriate with a girl who loved me as a grandfather."

Detective Sexton denied finding any motive for LS or Mother to falsely accuse the Defendant of these actions. She stated, "I mean, actually by coming forward with this they jeopardized their support, not only the emotional support but the financial support they had been receiving from him." In her investigation, she learned that the Defendant once had been a teacher at Hermitage Hall, which is a residential treatment facility for juvenile male sexual offenders.

Detective Sexton called the Defendant at some point later and asked him to come to the police station to tell "his side of the story." He acquiesced and drove himself to and from the station for the interview. In this discussion, the Defendant was not as "forthcoming" about his actions in these situations as he had been with Mother. The State played the videotaped recording of this interview in court.

On cross-examination, Detective Sexton stated that the Defendant was free to leave the interview at any point and that he was not in custody. She also acknowledged that the handwritten list by LS of the incidents with the Defendant did not include the incident in the kitchen. On redirect examination, however, Detective Sexton stated that LS told her that the

incident in the kitchen was the first incident with the Defendant that LS could remember. LS told Detective Sexton that LS and the Defendant were in the kitchen while Mother was in the living room and that the Defendant "asked [LS] for a hug and he touched her butt after the hug." Upon further cross-examination, Detective Sexton identified a police report from the original patrol officer in the case and noted that the report did not include an allegation regarding the incident in the kitchen. She noted, however, that patrol officers, in situations like this one, are not supposed to ask the children for details regarding these allegations.

At the conclusion of the State's proof, the defense moved for a judgment of acquittal, which the trial court denied. The Defendant chose not to testify and presented no proof. Following deliberations, the jury found the Defendant guilty of two counts of aggravated sexual battery and one count of solicitation of a minor.

At the sentencing hearing, the presentence report was admitted as an exhibit without objection, and it is included in the record before us. TS[2] testified that, in September 1998, she was twelve years old. The Defendant assisted her family because they had financial hardship and her mother recently had passed away. TS recalled the first time that she went to the Defendant's home as follows:

> It was me, and my brother, and my auntie and we went to [the Defendant's] house and he was taking photographs of us. He left my brother and auntie downstairs watching TV, and he took me upstairs to his bedroom and was taking pictures of me on his bed in his bedroom, and he had me suck his thang [sic], and then he laid me on my back and had sex with me.

TS clarified that the Defendant's "thang" was his penis. She experienced this behavior from the Defendant on more than one occasion. The Defendant had told her not to tell anyone, so she did not say anything about these incidents until the charges arose in the present case.

Pastor Bruce Maxwell testified regarding his past conflicts with the Defendant as follows:

> The prior incident that happened with [the Defendant] was the fact that there was another family in our church and – what took place was he had become close to that family also, and the allegation of events that the child brought against him was the fact that he had propositioned her for oral sex as

---

[2] TS is an individual unrelated to this case who also alleged sexual misconduct by the Defendant.

well as he had began [sic] to feel upon her inappropriately for an older man to do so.

With that situation at that time the church did not understand, or neither did I, what the ramifications were as far as the law is concerned. We thought that we had handled that situation appropriately in putting him out of the pulpit along with asking him to leave the church.

On cross-examination, Pastor Maxwell acknowledged that he did not contact police when he learned about this first allegation involving the Defendant. He stated, however, that when Mother approached him about the incidents with LS and the Defendant, he urged Mother to contact police.

Pastor Maxwell stated that, because of the Defendant's behavior, his church has changed their policy in that the people who work with youth must undergo a background check. He stated,

I loved [the Defendant] dearly and I still – I hold no animosity towards [the Defendant], I want this court to know that. I still love him, but what I don't like and what I cannot stand is what he did to a child. I have lost sleep over knowing he was allowed in our congregation to do what he did to children.

Mother read a statement she prepared for the sentencing hearing which stated:

My family and I looked up to [the Defendant] as a man of God. To me, that is a big title. We trusted him with our all and to go through such lengths to retrain that trust I think is very cruel.

He shattered my children's faith. They don't trust people in the church, so they don't go any longer. He misrepresented God to the fullest. We loved him so much but not more than God. I am here standing up for God, so I ask Your Honor to allow [the Defendant] the maximum time he can receive for the betrayal of myself, my daughter, as well as my family. Thank you.

Tracie Ann Vine-Walker, the Defendant's daughter, testified,

What we have heard today is not the father I know. He has raised me to be honorable, upstanding, and loving. . . . He has always been committed to the community that he has lived in by teaching us to do volunteer work and try to make our communities better.

He has done things like teaching men 56 years old that never knew how to write their name how to read and write. He has given back to the community for health issues, teaching people about HIV, and helping people who had been on drugs that their families had turned away from them. He is an honorabl[y] discharged Vietnam Veteran, and I just – I don't condone anything, but I just wanted people to know that the father I know is not what you are hearing today.

She stated that the Defendant "has had a heart attack, he's diabetic, and he suffers from Post-Traumatic Stress Disorder."

The Defendant testified,

I – there's no excuse for my inappropriate behavior so I – I offer no excuse. I do offer to [LS's] family the sincere apology for the anguish and the pain that I have caused them. I know that they have suffered, particularly the mother and daughter, greatly, and I'm so very very sorry for that. I am also sorry for my family and all that they are going through with the shame that I brought onto them. I apologize to anyone that has been impacted by the inappropriate actions that I undertook.

I have tried to give back to my community. I have served on the Foster Care Review Board of Davidson County, and was a court appointed special advocate for Judge Green for a short period of time, but none of that erases the inappropriateness of what I have done. I can only pray that, Your Honor, you would find it in your heart to show mercy on me as God has shown mercy on you.

I'm 68 years old and I hope that I don't die in prison, but if that is where the Lord takes me from then that is where I will go. What I do realize, beyond a shadow of a doubt, is that since I have been incarcerated for these last couple of months I have taught G.E.D. preparation for many of the men that are in there. We've had Bible study for – good or bad, I'm still a minister.

I know God has used all types of people with checkered backgrounds to serve him, so I am still serving the Lord there. Wherever I go, whether it is outside of the institution or inside, I plan to continue to teach and prepare people to get their G.E.D. and improve their lives.

. . . .

So I – I hope and I pray that my sentences would be concurrent and that I would be given an opportunity to serve those sentences and to get out. I'm prepared for whatever programs are available to me and I shall certainly, with a whole heart, participate in them.

On cross-examination, the Defendant acknowledged that the Department of Children's Services investigated similar allegations against the Defendant to those in this case made by a male child from Hermitage Hall.

At the conclusion of the sentencing hearing, the State asked the trial court to consider the first statutory enhancement factor – that the Defendant had a previous history of criminal convictions or behavior. The State also asked that the trial court consider the fourteenth statutory enhancement factor – that the Defendant abused a position of private trust. Additionally, the State requested consecutive sentencing in light of the Defendant's two convictions involving sexual abuse of a minor and given the Defendant's relationship with LS and abuse over a period of time. The defense asked that the trial court consider mitigating factors such as the Defendant's age and health.

The trial court initially stated, "There is no question in my mind that [the Defendant] is a child predator and has been for a number of years, and it is The Court's duty to sentence him." It applied both the first and fourteenth statutory enhancement factors and found that no mitigating factors applied. Accordingly, the trial court sentenced the Defendant as a Range I offender to eleven years for each of his aggravated sexual battery convictions and five years for his solicitation of a minor conviction.

With respect to consecutive sentencing, the trial court stated, "That gets me back to [Tennessee Code Annotated section] 40-35-115, multiple offenses. I think the General is right on when the General cites Factor No. 5. It is the judgment of The Court that Counts 1 and 2 will run consecutive, one with the other, and Count 3 will run concurrent." Accordingly, the trial court sentenced the Defendant to an effective sentence of twenty-two years' incarceration.

The Defendant filed a motion for new trial,[3] which the trial court subsequently denied. The Defendant timely appealed. On appeal, the Defendant argues that the trial court committed plain error in admitting as evidence a videotape of the Defendant's interview with

---

[3] In his motion for new trial, the Defendant did not argue that the trial court erred in admitting his videotaped interview with police. Thus, on appeal, he asserts that we should review this issue as a matter of plain error.

police; challenges the sufficiency of the evidence supporting his convictions; and asserts that the trial court erred in sentencing the Defendant.

## Analysis

### *The Defendant's Interview*

The Defendant first argues that the trial court erred in admitting as evidence the Defendant's videotaped interview with police. The Defendant, however, failed to object to the admission of the videotape at trial or address it in his motion for new trial. Therefore, this issue is waived. See State v. Gilley, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008) ("The failure to make a contemporaneous objection constitutes waiver of the issue on appeal."); Tenn. R. App. P. 3(e), 36(a). When an issue is waived on appeal, however, this Court nevertheless may grant relief on a determination that plain error was committed. See Tenn. R. App. P. 36(b); State v. Adkisson, 899 S.W.2d 626, 636-38 (Tenn. Crim. App. 1994). We will grant relief for plain error only when five prerequisites are satisfied:

> (1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the accused did not waive the issue for tactical reasons, and (5) consideration of the error is necessary to do substantial justice.

State v. Banks, 271 S.W.3d 90, 119-20 (Tenn. 2008); see also Adkisson, 899 S.W.2d at 641-42. The Defendant bears the burden of demonstrating plain error, and this Court need not consider all five factors "when it is clear from the record that at least one of them cannot be satisfied." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007).

The Defendant first argues that this evidence should have been excluded under Tennessee Rule of Evidence 403 based on its prejudice to the Defendant.[4] The Defendant also argues that the admission of the video violated the Confrontation Clause because it contained the substance of testimonial statements by the victim. Finally, the Defendant asserts that LS's statements as posed by the officers in the videotaped interview were inadmissible prior consistent statements.

Here, we need not determine whether the trial court erred in admitting the videotaped interview on any of these grounds because we conclude that substantial justice does not

---

[4] Tennessee Rule of Evidence 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice."

require relief. See State v. Hatcher, 310 S.W.3d 788, 808 (Tenn. 2010). Specifically, the Defendant has failed to establish that "the error was so significant that it 'probably changed the outcome of the trial.'" See id. (quoting State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000)). The jury had before it the testimony of LS regarding these specific encounters with the Defendant. Moreover, Mother and Pastor Maxwell testified that the Defendant, when confronted with these allegations, apologized for his actions. Therefore, this issue does not rise to the level of plain error, and the Defendant is entitled to no relief.

*Sufficiency of the Evidence*

The Defendant next contends that the evidence was not sufficient to support his convictions. Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our supreme court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

The weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Furthermore, it is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003) (citations omitted).

## Aggravated Sexual Battery

Aggravated sexual battery is defined as "unlawful sexual contact with a victim by the defendant or the defendant by a victim" where the victim is less than thirteen years old. Tenn. Code Ann. § 39-13-504(a)(4) (2006). "Sexual contact" is defined as including "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Id. § 39-13-501(6) (2006). "Intimate parts includes the primary genital area, groin, inner thigh, buttock or breast of a human being." Id. § 39-13-501(2).

In this case, the State elected two specific instances of unlawful sexual contact between the victim and the Defendant: the Defendant's touching of LS's buttocks in the Defendant's kitchen, and the Defendant's touching of LS's buttocks in the Defendant's office at church. In support of these alleged criminal acts, LS testified that, in the first instance, she was in the kitchen of the Defendant's house. The Defendant asked LS for a hug, and when they hugged, he placed his hands on her "behind." She clarified later that the Defendant touched her over her clothes. As to the second instance, LS testified regarding a time that she was alone with the Defendant in his office at church. The Defendant told LS that she was "ashy" and that he had some lotion. LS recalled, "He just told me to come here and he put lotion down my butt." She continued, "He rubbed some lotion on his hands, and then he placed his hands down my pants." She clarified that the Defendant put his hands down the back of her pants "[o]n the skin" while she was standing up.

Additionally, Mother testified that she eventually confronted the Defendant regarding this behavior. She stated,

> He dropped down his head and he said, I'm so sorry. He said, I am a fool, and God forgives fools. He said, I did that. I said, Why? . . . He said, I get lonely sometimes. He said, I know that was wrong and I'm so sorry, I hope that y'all can forgive me one day.

Moreover, Pastor Maxwell testified regarding his conversation with the Defendant as follows:

> [The Defendant] faked a cry to try to squeeze out a tear and I asked him, What have you done, and why did you do it? He was sitting there, and he was shaking his head. I asked him specifically, What he had done and he told me at that time that he had gotten carried away. He had started to put lotion on the

child's back, and he did tell me he tried to get into her panties to get to her privates.

The Defendant contends that the State failed to establish that the Defendant's touching could "be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6). We disagree. LS testified that, on several occasions, the Defendant took pictures of her backside. One night, LS spent the night with the Defendant at his house. At some point, she woke up and realized that "[h]e was behind [her] – [she] just felt him moaning, and . . . that his toes was [sic] on [hers]." She also remembered that "his hand was around [her] waist." LS went back to sleep, and when she woke up, she was lying at the foot of his bed. She was confused at the time as to how she got there. The Defendant told her that, if her mother ("Mother") asked, LS should say that she slept in the guest bedroom.

After the incident in the Defendant's office, he told LS "that he had a dream about [her] and that he just hoped God wouldn't let him have dreams about [her] like that, about him touching [her]." Moreover, the Defendant apologized to Pastor Maxwell for getting "carried away" and told Mother, "I'm so sorry. . . . I am a fool, and God forgives fools. . . . I did that. . . . I get lonely sometimes."

Therefore, viewing the evidence with the strongest legitimate view in favor of the State, see Harris, 839 S.W.2d at 75, we conclude that the State introduced sufficient evidence for a jury to convict the Defendant of both counts of aggravated sexual battery. Accordingly, the Defendant is entitled to no relief on this issue.

### Solicitation of a Minor to Commit Aggravated Sexual Battery

Solicitation of a minor to commit aggravated sexual battery is committed when

a person eighteen (18) years of age or older, by means of oral, written or electronic communication, electronic mail or Internet services, directly or through another, to intentionally command, request, hire, persuade, invite or attempt to induce a person whom the person making the solicitation knows, or should know, is less than eighteen (18) years of age, . . . engage[s] in conduct that, if completed, would constitute a violation by the soliciting adult of . . . (4) [a]ggravated sexual battery, pursuant to §39-13-504.

Tenn. Code Ann. § 39-13-528(a) (2006).

The State elected as its specific instance of alleged solicitation the time in which the Defendant told LS that he would buy her a pizza if she would let him touch her. At trial, LS testified that, on one occasion, she called the Defendant to ask him to order pizza for her. According to LS, he told her, "I will order you the pizza . . . but . . . you have to do something for me." She asked if it was for him to see her in her bathing suit, and he said, "No, something else. . . . You have to let me touch you." LS believed that the Defendant meant "touching" in a sexual way. In this regard, LS testified, "I already knew that it was a sexual contact because it is different between touching and somebody just with your hands just somewhere that is not on your private parts, but for him to make that clear statement 'touching' that means it's in a different way."

Viewing the evidence with the strongest legitimate view in favor of the State, see Harris, 839 S.W.2d at 75, we conclude that the State introduced sufficient evidence for a jury to find that the Defendant, through oral communication, requested that LS allow him to commit aggravated sexual battery by "touching" her. Accordingly, the Defendant is entitled to no relief on this issue.

*Sentencing*

The Defendant also challenges the length of his sentence and the trial court's ordering of partially consecutive sentences.

Prior to imposing a sentence, a trial court is required to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections ] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

-15-

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2006).

The referenced "principles of sentencing" include the following: "the imposition of a sentence justly deserved in relation to the seriousness of the offense" and "[e]ncouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs." Tenn. Code Ann. § 40-35-102(1), (3)(C) (2006). Moreover, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(4), (5) (2006).

Our Sentencing Act also mandates as follows:

In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Additionally, a sentence including confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1).

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision." Id. at 709. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401 (2006), Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

The sentencing range for aggravated sexual battery, a Class B felony, see Tenn. Code Ann. § 39-13-504, for a Range I offender is between eight and twelve years, see id. § 40-35-112(a)(2) (2006). The sentencing range for solicitation of a minor to commit aggravated sexual battery, a Class C felony, see id. § 39-13-528, for a Range I offender is between three and six years, see id. § 40-35-112(a)(3). After determining that the Defendant was a Range I offender, see Tenn. Code Ann. § 40-35-105 (2006), the trial court applied as enhancement factors the Defendant's past criminal behavior and the Defendant's abuse of a position of private trust. See id. § 40-35-114(1), (14) (2006). The trial court found that no mitigating factors applied.

The record supports the trial court's application of both enhancement factors. Initially, we look at the first enhancement factor: that "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range." See id. § 40-35-114(1). At the sentencing hearing, TS, an individual unrelated to the present case, testified that, when she was approximately twelve years old,

It was me, and my brother, and my auntie and we went to [the Defendant's] house and he was taking photographs of us. He left my brother and auntie downstairs watching TV, and he took me upstairs to his bedroom and was taking pictures of me on his bed in his bedroom, and he had me suck his thang [sic], and then he laid me on my back and had sex with me.

-17-

TS clarified that the Defendant's "thang" was his penis. She experienced this behavior from the Defendant on more than one occasion. Additionally, Pastor Maxwell testified that the reason that the Defendant was asked to leave his church was because "he had propositioned [a child] for oral sex as well as he had began [sic] to feel upon her inappropriately." Thus, given the testimony of other criminal behavior, the trial court's application of this factor was proper. See id.

Next, we look at the other factor applied by the trial court: that "[t]he defendant abused a position of public or private trust." See id. § 40-35-114(14). At the sentencing hearing, Mother read the following statement:

> My family and I looked up to [the Defendant] as a man of God. To me, that is a big title. We trusted him with our all and to go through such lengths to retrain that trust I think is very cruel.
>
> He shattered my children's faith. They don't trust people in the church, so they don't go any longer. He misrepresented God to the fullest. We loved him so much but not more than God. I am here standing up for God, so I ask Your Honor to allow [the Defendant] the maximum time he can receive for the betrayal of myself, my daughter, as well as my family. Thank you.

Additionally, LS testified about her relationship with the Defendant. She testified about his position with the church and about the Defendant's requesting that she call him "Granddad" or "Grandfather." Therefore, based upon this evidence, we hold that the trial court's application of this factor was proper. See id. Accordingly, the trial court did not abuse its discretion in sentencing the Defendant to eleven years for each of his two aggravated sexual battery convictions and five years for his solicitation of a minor conviction.[5]

Finally, the Defendant challenges the partial consecutive service of his sentences. The Criminal Sentencing Reform Act of 1989 provides that a trial court may order consecutive sentences on any one or more of several statutory bases. See Tenn. Code Ann. § 40-35-115(b) (2006). One of those bases is that a preponderance of the evidence establishes that

> [t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances

---

[5] We note that the trial court did not state on the record at the sentencing hearing that it considered "[a]ny statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee." See Tenn. Code Ann. § 40-35-210(b)(6). The sentencing statute requires consideration of this information.

arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims.

Tenn. Code Ann. § 40-35-115(b)(5). In addition to this criterion, "consecutive sentencing is guided by the general sentencing principles providing that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed,'" although specific factual findings are not necessary. State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002); see also Tenn. Code Ann. §§ 40-35-102(1), -103(2); In re Sneed, 302 S.W.3d 825, 828-29 (Tenn. 2010).

With respect to consecutive sentencing, the trial court stated, "That gets me back to 40-35-115, multiple offenses. I think the General is right on when the General cites Factor No. 5. It is the judgment of The Court that Counts 1 and 2 will run consecutive, one with the other, and Count 3 will run concurrent."

A review of the record in this case leads us to conclude that the evidence supports the trial court's imposition of partially consecutive sentences under Tennessee Code Annotated section 40-35-115(b)(2). The Defendant was convicted of multiple offenses involving the sexual abuse of a minor. LS testified regarding her encounters with the Defendant which spanned a period of approximately one to two years. Additionally, the Defendant had fostered a close-knit relationship with LS's family over the course of several years in which the family relied on him for financial and other support. Moreover, Mother, in her statement at the sentencing hearing, told the trial court that, as a result of the Defendant's behavior, the Defendant "shattered [her] children's faith. They don't trust people in the church, so they don't go any longer." Finally, TS testified about the Defendant's prior undetected sexual activity, and Pastor Maxwell testified to yet additional improper sexual behavior with another minor by the Defendant. Therefore, we hold that the trial court imposed these sentences in a manner consistent with the purposes, principles, and goals of the Sentencing Act. Thus, the trial court did not err in imposing partially consecutive sentences. Accordingly, the Defendant is entitled to no relief on this issue.

## CONCLUSION

For the reasons set forth above, we affirm the judgments of the trial court.


_____
JEFFREY S. BIVINS, JUDGE